**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Allan A. MUSSARI, Defendant–Appellant.**

No. 97–10331.

United States Court of Appeals,
Ninth Circuit.

Feb. 22, 1999.

---

Before: REINHARDT, NOONAN, and THOMPSON, Circuit Judges.

The panel has voted to deny the petition for rehearing.

An active judge requested, sua sponte, a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R.App. P. 35.

Appellee's petition for rehearing is DENIED.

KOZINSKI, Circuit Judge, with whom T.G. NELSON, Circuit Judge, joins with respect to Parts I, II, IV, V and VI, and SILVERMAN and GRABER, Circuit Judges, join with respect to Parts I, II, IV and V, dissenting from the order rejecting the suggestion for rehearing en banc.

A panel of this court—actually a two-judge majority [1]—has once again mounted the bully pulpit in order to lecture another branch of government about how to do its job. This time the target is the Executive Branch and the sermon concerns the enforcement of the Child Support Recovery Act of 1992, 18 U.S.C. § 228 (1994) (amended 1998) (CSRA), which puts the force of federal law behind efforts of abandoned mothers to collect child support from fathers who will not live up to their parental responsibilities. In what can only be termed a rhetorical excess, the majority calls the government an "unfeeling monster" that has "[made] the law hideous" in prosecuting poor, hapless Mussari.

By making a victim out of Allan Antonio Mussari, who "never paid voluntarily a dime" of the almost $70,000 in child support he owes, the majority spits in the eye of Susan Riley, the discarded wife who raised Mussari's children while he was off earning good money and carousing with his friends. It also harms the thousands of other mothers who struggle to raise children after being abandoned by irresponsible fathers, and undermines the enforcement of an important federal law designed to help them. To add injury to insult, the panel is also dead wrong on the law, in two ways, not one. I cannot

allow such a grievously misguided opinion to remain on the books without comment.

I

The majority closes the opinion with four gratuitous dicta, the last of which warrants a close look:

[I]n choosing among the thousands of persons delinquent in honoring their child support obligations, the government need not show itself an unfeeling monster, or make the law hideous, by selecting as its target an ineffectual worker, plagued by accidents and bad luck, without assets to make any restitution, without children to whom he has any legal connection, and with a present wife and family to whom he has important ties.

*United States v. Mussari*, 152 F.3d 1156, 1159 (9th Cir.1998) [*Mussari II* ]. This highly inappropriate and factually unfounded sermon has no legitimate place in an opinion of this court. Second-guessing the exercise of prosecutorial discretion reflects a fundamental disregard for the principle of separation of powers. An opinion of this court is not a platform from which individual judges should express their personal views about the wisdom of federal legislation and enforcement efforts. *Cf. United States v. Harris*, 165 F.3d 1277, 1277 (9th Cir.1999) (Kozinski, J., dissenting from the order rejecting the suggestion for rehearing en banc).

It would be much different if the government here had engaged in prosecutorial misconduct, *see, e.g., United States v. Kojayan*, 8 F.3d 1315 (9th Cir.1993), but it did not. The Department of Justice attorneys who worked on this case conducted themselves honorably. The majority's complaint is that they did not give Mussari a pass for violating federal law. But whom to prosecute and whom to leave alone is the heart and soul of prosecutorial discretion, a decision committed to the Executive Branch and "particularly ill-suited to judicial review." *Wayte v. United States*, 470 U.S. 598, 607, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). The criminal justice system affords potential defendants several layers of protection against rogue prosecutors. Specific to

---

1. Judge Thompson disagreed with this portion of the majority opinion.

the child support arena, prosecutors must consider eight factors in deciding whether to file charges under the CSRA, including whether a state agency has referred the case, whether the parent has failed to pay after being held in contempt, whether the children are minors and whether particular circumstances dictate the need for immediate federal intervention. *See* U.S. Dep't of Justice, *United States Attorneys' Criminal Resource Manual* §§ 1950, 1954 (1998). After identifying a prospective defendant, the FBI will investigate and the U.S. Attorney will send the delinquent parent two letters advising him to pay or provide an adequate explanation for nonpayment. *See* Ronald S. Kornreich, Note, *The Constitutionality of Punishing Deadbeat Parents: The Child Support Recovery Act of 1992 After United States v. Lopez,* 64 Fordham L.Rev. 1089, 1098 (1995) (detailing Attorney General's guidelines for CSRA prosecutions). Several Assistant U.S. Attorneys review and approve any decision to prosecute. After all this, the U.S. Attorney has to convince a grand jury to indict. *See* Fed.R.Crim.P. 6(f).

The judicial branch has no proper voice in this process. The federal enforcement agenda is "not readily susceptible to the kind of analysis the courts are competent to undertake." *Wayte,* 470 U.S. at 607, 105 S.Ct. 1524. Reexamining prosecutorial decisions "entails systemic costs," such as delaying justice, chilling law enforcement, and "undermin[ing] prosecutorial effectiveness by revealing the Government's enforcement policy." *Id.* By injecting themselves into a process in which judges have no legitimate role to play, the majority has compromised the neutrality of the court and taken us into the treacherous waters of politics.

## II

Worse is the majority's choice of Allan Mussari as the poster boy for the "prudent" enforcement of the CSRA. The majority's image of a sweet high school romancer who would eagerly have satisfied his parental responsibilities but for a string of bad luck, is belied by the record. Just before leaving his wife and two small children, Mussari slashed the tires on his wife's car, ransacked their apartment and scrawled "slut" on the wall. While his ex-wife and children scraped by on welfare, Mussari worked almost continuously as a truck driver, painter, cook and bartender, earning between $5 and $12 an hour. By his own admission, he "can always find work" and, according to a former employer's description at trial, he is quite an effectual worker—a "valuable employee" and "quick learner." Even after being fired in 1995 for drinking on the job, he was able to find work again as a trucker. And, as the district court found, Mussari "had income in addition to his pay"—income he did not report on his tax returns and chose to spend on self-indulgences, such as buying drinks for his friends on a regular basis.[2] Mussari also subsidized his stepchildren's housing, but never did he voluntarily pay one cent of the small fortune he owes his own children. Never has he even visited them. Mussari is no "ineffectual worker plagued by accidents and bad luck," as the majority would have it. He is a man who, in Judge Thompson's words, "would rather [have gone] to jail than contribute toward the support of his children." *Mussari II,* 152 F.3d at 1159 (Thompson, J., concurring).

The majority's arguments as to why Mussari should have escaped prosecution range from the perverse to the irrelevant. That Mussari no longer has any "legal connection" to his children surely counts against him, not for him. His parental rights were severed by Arizona precisely because he neglected his children and treated them like strangers. According to the majority's peculiar logic, the more a father neglects his children, the less likely he is to be prosecuted. Nor should the fact that Mussari is "without assets to make any restitution" help him. Over the years, the state courts adjudged Mussari capable of supporting his children and entered awards that balanced their needs with his ability to

2.  Q. [Prosecutor] [Y]ou guys would go out drinking and you'd take turns paying for alcohol, correct?
     A. [Mussari] Yes.

Q. The money you spent on alcohol could have been spent to pay for the child support, right?
A. Yes.

pay.[3] That arrearages are now close to $70,-000 is Mussari's own doing—a direct consequence of his refusal to make the slightest effort to meet his obligations when he had the money. Why should United States Attorneys give a free pass to irresponsible parents who dissipate their assets rather than helping to raise their dependents? Congress had quite the contrary in mind when it passed the CSRA.[4] Finally, what difference does it make that Mussari has "important ties" with "his present wife and family"? If his financial situation has changed, he can petition the state courts to reduce or eliminate the child support payments. But why does Mussari deserve a Get Out of Jail Free card because he has taken on new familial obligations while ignoring his existing ones?

Susan Riley, and we the taxpayers, have long paid for Mussari's obstinate refusal to feed the children he brought into the world. Mussari's shameful irresponsibility forced Riley onto the welfare rolls, yet she managed to make something of herself by finishing college and becoming a registered nurse, all the while caring for her children. Mussari's conviction sent a loud, clear message that his conduct was deplorable, and vindicated Susan Riley's struggles and her responsible choices. Then, in one tortured sentence, the majority takes it all away by making it sound as if Mussari was somehow justified in his obduracy. Susan Riley and her children—and the hundreds of thousands of other abandoned mothers and children across the country—deserve better.

### III

In addition to compromising the legitimacy of this court and belittling the struggles of single mothers, the majority's ill-founded rebuke jeopardizes the effective enforcement of an extremely important federal statute.

The story of Susan Riley and her children is, unfortunately, all too common. In 1989, there were about ten million single-mother families—over three million of which lived in poverty. See H.R.Rep. No. 102–771, at 4–5. Approximately 140,000 of those families would have risen above the poverty line if the absentee father had just paid the child support obligation a state court had found him capable of paying. See Reinventing Child Support Enforcement: Testimony Before the Subcomm. on Human Resources of the House Comm. on Ways and Means, 103d Cong., 1994 WL 14191009, at 22 (1994) (statement of Richard (Casey) Hoffman, President, Child Support Enforcement * CSE). All told, over $5 billion in child support obligations went unpaid that year. See H.R.Rep. No. 102–771, at 5. Of that, $1.6 billion was attributable to out-of-state fathers. See U.S. General Accounting Office, Fact Sheet for Congressional Requesters: Interstate Child Support–Mothers Report Receiving Less Support From Out–Of–State Fathers 16 (1992). Only 43% of mothers with support awards against such fathers-in contrast to 60% of mothers with in-state awards—actually collected their money on a regular basis. See id. at 15.

These complex figures tell a simple story. Abandoned parents with small children—almost always mothers—are in no position to pursue their former partners to enforce child support obligations. They cannot afford the investigators, lawyers and collections agents needed to find delinquent fathers and make them pay what they owe. The problem is complicated when an uncooperative father, like Mussari, moves out of state, where distance and a different legal system make enforcement of a local child support decree even more difficult. For many years, scoundrels like Mussari got away with it while mothers like Susan Riley suffered and could do nothing about it.

---

**3.** The state courts originally awarded $752 per month, but later reduced the required support to $256 per month to reflect Mussari's reduced earning capacity. Mussari paid not $752; not $256; not a red cent. The only money that Susan Riley ever saw was the few dollars she obtained from garnishing Mussari's wages and tax refunds.

**4.** When enacting the CSRA, Congress stated: "[A] child should be able to expect the most basic support from those [who] chose to bring the child into the world. . . . [T]he burden of caring for these children will be placed on the shoulders of the parents-where it rightfully belongs." H.R.Rep. No. 102–771, at 6 (1992).

Congress recognized this problem in 1992, and passed the CSRA to cut through the "labyrinth of extradition laws and snarls of redtape" that had hobbled interstate enforcement of child support decrees. 138 Cong. Rec. H7324–01, H7325 (daily ed. Aug. 4, 1992) (statement of Rep. Schumer). No longer were abandoned mothers left to their own devices while absentee dads played games of hide and seek with their assets. The federal criminal law, and federal criminal enforcement agencies like the FBI and the United States Attorney's office, would help even the balance. As with other criminal laws, the main enforcement weapon would be deterrence by vastly raising the stakes for fathers who leave the state in the hope of evading their child support obligations.

The majority obviously thinks that federal enforcement efforts under the CSRA have run amok, and it views Mussari's prosecution as a prime example. This is sadly out of touch with reality. In the first two years of the CSRA's existence (the period in which Mussari was indicted), the federal government brought only five prosecutions. *See* 140 Cong. Rec. S9379–02, S9430 (daily ed. July 21, 1994) (statement of Sen. Kohl). This caught the attention of legislators, who loudly chastised the Justice Department for "buck passing" and "virtually ignor[ing]" the CSRA. *Id.* at S9425 (statement of Sen. Shelby). Even President Clinton used his State of the Union address to call on federal prosecutors to "track [deadbeat parents] across state lines." *The State of the Union: Clinton Speech Envisions Local Empowerment*, 53 Cong. Q. Wkly. Rep. 300, 1995 WL 7447015, at 20 (1995). Getting the message, the Justice Department finally began to pursue an increasing number of deadbeat dads. By the end of 1997, U.S. Attorneys had filed 386 cases under the CSRA and secured 165 convictions. *See* 143 Cong. Rec. S12,667–01, S12,667 (daily ed. Nov. 13, 1997) (statement of Sen. Kohl). This past June, Senator Kohl reported that interstate support collections have increased by almost fifty percent. *See* 144 Cong. Rec. S5734–02, S5734 (daily ed. June 5, 1998) (statement of Sen. Kohl).

Still, the Department of Justice has made it clear that it does not intend "to use the CSRA as a mere mechanism to collect child support." 140 Cong. Rec. S9379–02, S9426 (daily ed. July 21, 1994) (letter from Sheila F. Anthony, Assistant Attorney General to Sen. Richard Shelby). While setting enforcement goals is certainly the Department's prerogative, *see supra* at 1142–43, statistics and anecdotes make it clear that its efforts are not satisfying current demand. An estimated $34 billion in unpaid child support still lines the pockets of selfish absentee parents. *See* 144 Cong. Rec. H3042–01, H3046 (daily ed. May 12, 1998) (statement of Rep. Roukema). And meritorious cases continue to slip through the cracks by the hundreds. Consider the story of Marcia Walsh, whose former husband lives out of state and refuses to pay his support obligation. She earns $14,000 from her night job so that she can support her seven children from day to day. Yet no state or federal agency has helped her recover her child support. *See* 144 Cong. Rec. S5734–02, S5734 (daily ed. June 5, 1998) (statement of Sen. DeWine).

Indeed, Congress recently recognized that the FBI and federal prosecutors need additional incentives to investigate and prosecute interstate child support cases. Hence it passed the Deadbeat Parents Punishment Act of 1998, which amends the CSRA to make it a felony to, among other things, willfully fail to pay a child support obligation for more than two years, or to pay such an obligation that is worth more than $10,000. *See* Deadbeat Parents Punishment Act of 1998, Pub.L. No. 105–187, 112 Stat. 618 (codified at 18 U.S.C.A. § 228 (West Supp.1998)); *see also* 144 Cong. Rec. S5734–02, S5734 (daily ed. June 5, 1998) (statement of Sen. DeWine). After more than six years with the CSRA in force, prosecutors are making some inroads. But it is clear that overzealous prosecutors should not be at the top of anybody's list of concerns when it comes to the area of child support. Quite the contrary.

Nor has the federal judiciary been particularly hospitable to this statute. The majority's broad hint that the government ought not to bother us with cases such as this in the

future is only the latest wrinkling of the federal judicial nose. Federal judges have not been shy in expressing their displeasure at being handed such low-grade work. *See, e.g., United States v. Bailey*, 115 F.3d 1222, 1239 (5th Cir.1997) (Smith, J., dissenting) ("The CSRA is redolent of a police power, not a responsible and reflective exercise of legislative authority...."); Letter from J. Clifford Wallace, Chief Judge, United States Court of Appeals for the Ninth Circuit, to The Honorable William H. Rehnquist, Chief Justice of the United States (Mar. 29, 1993), *reprinted in* William P. Marshall, *Federalization: A Critical Overview*, 44 DePaul L.Rev. 719 app. A at 740 (1995) ("Will ... increased federalization of the law abate? Last year, Congress made ... the willful failure to pay child-support obligations [a] federal crime[ ].... [T]he federal government alone cannot solve every problem confronting our nation. The fact that a particular area of the law could be handled in federal court does not necessarily mean that it should be."). Indeed, District Judge Paul G. Rosenblatt stated during Mussari's trial that "I will go to my grave believing that [the CSRA is unconstitutional].... I thought I'd gotten out of the child support business when I left the state courts. Those were impossible cases to resolve then. Unfortunately the court finds itself back in the business to a limited degree now, and they are equally as impossible today." Judicial comments such as these can't help but discourage prosecutions under the CSRA.

At least these earlier criticisms have come from individual judges, speaking only for themselves. My colleagues here are more ambitious—they purport to speak for the Ninth Circuit as a whole. I do not believe it is appropriate for a court to undermine enforcement of a federal statute, especially where Congress has twice in six years shown its firm commitment to the program.

### IV

The panel compounds the damage by breaching the well-settled plain error rule. Immediately after his December 1994 arrest, Mussari challenged his indictment on the ground that the CSRA was unconstitutional.

We rejected this argument on appeal. *See United States v. Mussari*, 95 F.3d 787 (9th Cir.1996). At no time during his initial challenge, after the district judge rendered his verdict, or in the initial stage of this appeal, did he claim that his indictment or conviction violated the Ex Post Facto Clause. The panel raised this issue sua sponte: "[The Child Support Recovery Act's] retroactive reach was not considered by the district court or this court on the first appeal, nor was it raised by the parties. Sua sponte we requested briefing." *Mussari II*, 152 F.3d at 1158.

Where a party failed to raise an issue below, we may notice only "[p]lain errors or defects affecting substantial rights." Fed. R.Crim.P. 52(b). The Supreme Court has spoken: A court of appeals may consider a forfeited error, "but cannot provide [a] remedy unless Rule 52(b) applies." *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). Ex post facto objections are no different from other types of objections that should have been raised below. In this circuit, "we will reverse only if [a forfeited ex post facto challenge] constituted plain error." *United States v. Baker*, 10 F.3d 1374, 1394 (9th Cir.1993); *see also United States v. Calabrese*, 825 F.2d 1342, 1346 (9th Cir.1987). We review for plain error even when a panel "*sua sponte* order[s] the parties to brief an issue not raised by [the] defendant." *United States v. Koff*, 43 F.3d 417, 418–19 (9th Cir.1994). By ignoring *Baker, Calabrese* and *Koff,* the panel acts in direct conflict with the law of this circuit and, indeed, of the land.

At best, the panel's plain error analysis—or lack thereof—provides litigants looking to circumvent the often deadly plain error rule with their citation of choice. At worst, the panel has opened our circuit to yet another rebuke. *See, e.g., Calderon v. Coleman*, — U.S. —, 119 S.Ct. 500, — L.Ed.2d — (per curiam). Neither is acceptable; both were avoidable.

### V

Had the panel asked the right question, it would have realized that there was no error here, let alone plain error that affected Mus-

sari's substantial rights. To be convicted for violating the CSRA, as it read at the time of Mussari's conviction, a parent must have (1) willfully failed to pay (2) a child support obligation that remained unpaid for longer than one year or exceeded $5000 (3) with respect to a child who resided in another state. *See* 18 U.S.C. § 228. Mussari's is an easy case. He resides in Illinois; his children live in Arizona. He's paid practically none of the $41,708 in child support plus $28,154.07 in interest that has accrued since his divorce in 1988. And, at all times between his divorce and his June 17, 1997, bench trial—including the more than four years since the CSRA's October 25, 1992, enactment—his failure to pay was willful.

The panel does not claim there was insufficient evidence to convict Mussari. Rather, they find his conviction deficient because the district judge found that Mussari willfully failed to pay his child support obligation for almost the entire eight year and eight month period between his divorce and trial. Judge Rosenblatt stated:

> [T]here is no doubt ... that the government has proven [Mussari's] ability to pay at some time during the portions of his employment on some dates that the obligations were due.... *So any time during the course of his arrearages that he had funds to pay, the court finds that he did have those funds to pay and did not pay them.* (emphasis added)

The panel finds it problematic that neither the indictment nor the district judge's verdict "drew [a] distinction between times before and after October 25, 1992." *Mussari II,* 152 F.3d at 1158.[5] But why was it necessary to draw this distinction? If Mussari willfully failed to pay child support for a nine-year period, it follows that he failed to do so for the lesser period covered by the CSRA. Recognizing the entire duration of Mussari's

default poses no ex post facto problem. The Ex Post Facto Clause prohibits "punishment for an act that was not punishable at the time it was committed." *Weaver v. Graham,* 450 U.S. 24, 28, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981) (quoting *Cummings v. Missouri,* 71 U.S. (4 Wall.) 277, 325–26, 18 L.Ed. 356 (1866)) (internal quotation marks omitted). It does not require that the factfinder be blind to other misconduct.

Reading the district judge's ruling in context belies any possible ex post facto objection. Each piece of evidence that the judge considered involved conduct that occurred, at least in its majority, after October 25, 1992: Mussari's almost continuous employment between 1988 and 1997; his failure to pay child support even after admitting in December 1992 that he could afford to pay $256 a month; underreporting his total income to the IRS on each tax return between 1991 and 1995; his contempt citations in state court in 1993 and 1994; and his refusal in 1995 to participate in a work furlough program that would have paid him a salary and saved him room and board.

The district judge merely failed to speak in the precise terms that the panel prefers. A timely objection would have allowed the judge to clarify his findings. In the absence of an objection, the panel should have read the district court's findings in the light most favorable to upholding the judgment, resolving any ambiguities so as to avoid an unconstitutional result. Failing to deliver a bench verdict in the clearest possible terms does not violate the Ex Post Facto Clause and, given the overwhelming evidence of Mussari's guilt, certainly is not plain error.

## VI

The panel's ill-conceived ex post facto analysis and inexcusable failure to apply the plain

---

5. Mussari's indictment alleged that "[f]rom on or about November 1, 1988, and continuing to the present, [Mussari] ... willfully and unlawfully failed to pay a past due support obligation." In encompassing conduct before and after the CSRA's enactment, this indictment is unremarkable. Other courts have tacitly approved similar charging instruments. *See, e.g., United States v. Johnson,* 114 F.3d 476, 478 (4th Cir.) (information alleging willful failure to pay from June 1991 to December 1995), *cert. denied,* —— U.S. ——, 118 S.Ct. 258, 139 L.Ed.2d 185 (1997); *United States v. Kegel,* 916 F.Supp. 1233, 1235 (M.D.Fla.1996) (between May 10, 1984 and September 20, 1995); *United States v. Sage,* 906 F.Supp. 84, 87 (D.Conn.1995) (from September 23, 1991 through July 13, 1995), *aff'd,* 92 F.3d 101 (2d Cir.1996), *cert. denied,* 519 U.S. 1099, 117 S.Ct. 784, 136 L.Ed.2d 727 (1997).

error rule are wrong as a matter of fact and law. However, it is the majority's egregious and misguided dictum about the proper enforcement of the CSRA that should give pause to judges, prosecutors, advocates and parents alike. Those who enforce the statute deserve our praise and encouragement; deadbeats like Mussari deserve a kick in the pants, not a verbal bouquet. The government did exactly the right thing in prosecuting Allan Mussari; it should do more of the same. In the meantime, I, for one, want Susan Riley and others like her to know that there are those in the federal judiciary who are mindful of their struggles, that not everyone who wears a robe is an unfeeling monster.

