# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AE JA ELLIOT-PARK,
          *Plaintiff-Appellee,*

v.

JARROD MANGLONA; MICHAEL
LANGDON; ANTHONY MACARANAS;
DEPARTMENT OF PUBLIC SAFETY,
          *Defendants-Appellants,*

and
NORBERT DUENAS BABAUTA,
          *Defendant.*

No. 08-16089

D.C. No.
1:07-cv-00021

OPINION

Appeal from the United States District Court
for the District of the Northern Mariana Islands
Alex R. Munson, District Judge, Presiding

Argued and Submitted
May 12, 2009—Honolulu, Hawaii

Filed January 12, 2010

Before: Alex Kozinski, Chief Judge, Jay S. Bybee and
Consuelo M. Callahan, Circuit Judges.

Opinion by Chief Judge Kozinski;
Partial Concurrence and Partial Dissent by Judge Callahan

887

## COUNSEL

Braddock Jon Huesman, Assistant Attorney General, CNMI Office of the Attorney General, Saipan, MP, for the defendants-appellants.

George L. Hasselback and Joseph E. Horey, O'Connor Berman Dotts & Banes, Saipan, MP, for the plaintiff-appellee.

## OPINION

KOZINSKI, Chief Judge:

We consider whether law enforcement officers who are accused of failing to investigate a crime or make an arrest due to the race of the victim and that of the perpetrator are entitled to qualified immunity.

## Facts

We recite the facts as Ae Ja Park Elliott* alleges them in her complaint. Elliott, who is racially and ethnically Korean, was driving south along 16 Highway in Papago, Saipan. Norbert Duenas Babauta, who is racially and ethnically Micronesian, was driving north along the same highway when he sped through a turn, crossed onto oncoming traffic and crashed into Elliott's car. Officer Manglona noticed the accident and approached. When Elliott asked him to call her husband, he shoved her inside her car and told her to shut up and calm down. Manglona then began conducting interviews of the witnesses, drivers and passengers. Officers Macaranas and Lang-

---

*The district court caption refers to Elliott as "Elliot-Park," and our caption follows the district court. Elliott explains on appeal that her correct name is "Ae Ja Park Elliott," which is the name we use in our opinion. Elliott may request that the district court docket be corrected by motion on remand.

don arrived shortly thereafter and spoke to both drivers. The officers are all racially and ethnically Micronesian.

The three officers had cause to believe Babauta had been driving under the influence of alcohol: He was teetering and slurring his words, he reeked of alcohol and had bloodshot eyes, his truck bed was littered with empty beer cans and he told Manglona that he had "blacked out" while driving. Despite these obvious signs of intoxication, the officers didn't administer field sobriety or blood alcohol tests, or otherwise investigate whether Babauta had been driving drunk. Nor did the officers charge him with a DUI or any other crime or infraction. Manglona also falsely stated in his accident report that Babauta "had not been drinking."

Dr. Thomas Austin, who examined Elliott and Babauta at the hospital, called DPS to complain after he learned that Babauta hadn't been charged with a DUI. After this complaint, and perhaps some others, the Department of Public Safety (DPS) initiated an investigation, but the three officers conspired with others to obstruct the investigation and prevent prosecution of Babauta. Elliott claims the officers failed to investigate the crime or arrest Babauta because of racial animus against her as a Korean and in favor of Babauta as a Micronesian.

On a motion to dismiss, the district court found that Elliott sufficiently alleged a 42 U.S.C. § 1983 equal protection claim and a 42 U.S.C. § 1985 conspiracy and obstruction of justice claim against the officers. The district court concluded the officers weren't entitled to qualified immunity at the motion to dismiss stage. The officers bring this interlocutory appeal.

**Analysis**

**[1]** Unlike prosecutors, who enjoy absolute immunity, police officers are entitled only to qualified immunity in section 1983 cases. *See Malley* v. *Briggs*, 475 U.S. 335, 341-43

(1986). In a qualified immunity appeal, we normally look first to whether a constitutional violation was alleged and then to whether the defendants have qualified immunity as a matter of law. *See Pearson* v. *Callahan*, 129 S.Ct. 808, 813 (2009). We review the district court's decision de novo. *Newell* v. *Sauser*, 79 F.3d 115, 117 (9th Cir. 1996).

**1.** According to Elliott, the three police officers refused to investigate the incident because Babauta is Micronesian and Elliott is Korean. Elliott also claims that Officer Macaranas fully investigated another drunk driving accident that occurred the same evening where the victim was Micronesian but the driver wasn't. The officers don't dispute that Elliott has pled facts from which a trier of fact could infer racial discrimination.

**[2]** Instead, the officers argue that individuals don't have a constitutional right to have police arrest others who have victimized them. But Elliott's equal protection claim isn't based on some general constitutional right to have an assailant arrested. Rather, she argues Babauta was given a pass by the police because of the officers' alleged racial bias not only in favor of Babauta as a Micronesian, but also against her as a Korean. And while the officers' discretion in deciding whom to arrest is certainly broad, it cannot be exercised in a racially discriminatory fashion. For example, a police officer can't investigate and arrest blacks but not whites, or Asians but not Hispanics. Police can't discriminate on the basis of the victim's race, either. We recognized as much in *Estate of Macias* v. *Ihde*, where we held that there is no right to state protection against madmen or criminals, but "[t]here is a constitutional right . . . to have police services administered in a nondiscriminatory manner—a right that is violated when a state actor denies such protection to disfavored persons." 219 F.3d 1018, 1028 (9th Cir. 2000); *see also DeShaney* v. *Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 197 n.3 (1989) ("The State may not, of course, selectively deny its protective

services to certain disfavored minorities without violating the Equal Protection Clause.").

**[3]** The officers concede that the Constitution protects against discriminatory withdrawal of police protection, but they claim that Elliott was not denied this right because they provided her with *some* police services: They called an ambulance and questioned bystanders. According to the officers, only a complete withdrawal of police protective services violates equal protection. But diminished police services, like the seat at the back of the bus, don't satisfy the government's obligation to provide services on a non-discriminatory basis. *See Navarro* v. *Block*, 72 F.3d 712, 715-17 (9th Cir. 1995) (alleged policy to treat domestic violence 911 calls less urgently could form the basis for an equal protection claim). Certainly the government couldn't constitutionally adopt a policy to spend $20,000 investigating each murder of a white person but only $1,000 investigating each murder of a person of color. Likewise, it doesn't matter that Elliott received some protection; what matters is that she would allegedly have received more if she weren't Korean and Babauta weren't Micronesian.

The officers also suggest that the equal protection clause only protects against selective denial of protective services, and that investigation and arrest aren't protective services unless there is a continuing danger to the victim. But the officers' understanding of protective services is too limited. If police refuse to investigate or arrest people who commit crimes against a particular ethnic group, it's safe to assume that crimes against that group will rise. Would-be criminals will act with a greater impunity if they believe they have a get out of jail free card if they commit crimes against the disfavored group. Babauta may well have been emboldened to drive drunk with empty beer cans rolling around in the back of his truck because he believed that he would suffer no ill consequences should he cause an accident.

In any event, whether investigation and arrest are protective services is immaterial. While the Supreme Court may have written in *DeShaney* that the government couldn't "selectively deny its protective services" to disfavored minorities, 489 U.S. at 197 n.3, that certainly doesn't imply that the government can selectively deny its non-protective services to disfavored minorities. The government may not racially discriminate in the administration of *any* of its services. *See Palmer* v. *Thompson*, 403 U.S. 217, 219-223 (1971) (government-funded pools cannot be operated on a racially discriminatory basis); *Hawkins* v. *Town of Shaw*, 437 F.2d 1286, 1288 (5th Cir. 1971) (municipal services cannot be provided on a racially discriminatory basis).

**[4]** The dissent agrees that the discriminatory denial of investigative services may violate equal protection. Dissent at 909. Nevertheless, our colleague questions whether Elliott has an equal protection claim based on the officers' failure to arrest Babauta because arrest decisions are entitled to deference and because Elliott probably suffered little harm. *See id.* at 901. But even the dissent recognizes that police officers aren't entitled to deference for their decision if it is based on racial animus. *See id.* at 899-900. And the fact that Elliott may not have been harmed much speaks more to whether she can recover anything beyond nominal damages than to whether she has an equal protection claim. *See also Flores* v. *Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1135-36 (9th Cir. 2003) (discriminatory failure to investigate *and discipline* student harassment complaints violates equal protection). Certainly, a plaintiff complaining of heart attack symptoms has a claim against a government hospital that turns him away because of his race, even if the symptoms turn out to be caused by heartburn. The officers' alleged discriminatory failure to arrest, as well as investigate, therefore violated equal protection.

**[5] 2.** Law enforcement officials are entitled to qualified immunity even where their conduct violated a constitutional

right unless that right was clearly established at the time of the violation. *Saucier* v. *Katz*, 533 U.S. 194, 202 (2001). The dispositive inquiry is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* Thus, our "task is to determine whether the preexisting law provided the defendants with 'fair warning' that their conduct was unlawful." *Flores*, 324 F.3d at 1136-37 (quoting *Hope* v. *Pelzer*, 536 U.S. 730, 740 (2002)).

**[6]** The right to non-discriminatory administration of protective services is clearly established. *See* p. 892 *supra*. Nevertheless, the officers argue that it wasn't clearly established that investigation and arrest are protective services. But the very purpose of section 1983 was to provide a federal right of action against states that refused to enforce their laws when the victim was black. *See Briscoe v. LaHue*, 460 U.S. 325, 338 (1983) ("It is clear from the legislative debates that, in the view of the Act's sponsors, the victims of Klan outrages were deprived of 'equal protection of the laws' if the perpetrators systematically went unpunished."); *Monroe* v. *Pape*, 365 U.S. 167, 174-180 (1961) ("It is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced . . . ."); *Smith* v. *Ross*, 482 F.2d 33, 37 (6th Cir. 1973) ("Particularly in view of the circumstances surrounding the passage of § 1983, including the concern for protecting Negroes from the widespread non-enforcement of state laws, the remedies provided in § 1983 are most appropriately extended to persons who, because of the unpopularity of their life-styles or the pervasiveness of racist animus in the community, are not protected . . . ." (citation omitted)). It hardly passes the straight-face test to argue at this point in our history that police could reasonably believe they could treat individuals disparately based on their race.

**[7]** The officers argue that Elliott's equal protection rights weren't clearly established because she can't find a case simi-

lar to hers—like a sobriety check and arrest case or a traffic case—where the court found an equal protection violation. But there doesn't need to be a prior case with materially similar facts in order for a right to be clearly established. *Flores*, 324 F.3d at 1136-37 ("In order to find that the law was clearly established, however, we need not find a prior case with identical, or even 'materially similar,' facts." (quoting *Hope*, 536 U.S. at 741)). This is especially true in equal protection cases because the non-discrimination principle is so clear. "The constitutional right to be free from such invidious discrimination is so well established and so essential to the preservation of our constitutional order that all public officials must be charged with knowledge of it." *Flores* v. *Pierce*, 617 F.2d 1386, 1392 (9th Cir. 1980).

We have recognized the absurdity of requiring equal protection plaintiffs to find a case with materially similar facts. In *Flores* v. *Morgan Hill Unified School District*, we held that public school administrators who failed to respond to gay students' harassment complaints were not entitled to qualified immunity. 324 F.3d at 1136-38. The administrators argued that "no Supreme Court or Ninth Circuit case had yet established a student's right under the Equal Protection Clause . . . to be protected by school administrators from peer sexual orientation harassment." *Id.* at 1136. But we reasoned that it was "not necessary to find a case applying the [equal protection] principle to a particular category of state officials, such as school administrators," because "[a]s early as 1990, we established the underlying proposition that such conduct violates constitutional rights: state employees who treat individuals differently on the basis of their sexual orientation violate the constitutional guarantee of equal protection." *Id.* at 1137. Thus, "[t]he defendants were officers of the state who had fair warning that they could not accord homosexual and bisexual students less protection." *Id.*

**[8]** Contrary to the dissent's claim, *see* dissent at 904, *Flores* isn't limited to the unique characteristics of the school

environment. Indeed, *Flores* found that school administrators were on notice that they had to treat gay students the same as straight students based on a case holding that state employees in general can't irrationally discriminate on the basis of sexual orientation. 324 F.3d at 1137. The same holds true here. It's been long established that state employees can't treat individuals differently on the basis of their race. The three officers thus had a more than fair warning that failure to investigate and arrest Babauta because of race violated equal protection.

\* \* \*

**[9]** The officers admit their appeal of the district court's refusal to dismiss Elliott's section 1985 claim, which alleges that the defendants conspired to deny her equal protection, is tied to the success of their appeal of the section 1983 claim. The district court did not err in failing to dismiss the section 1983 and section 1985 claims.

AFFIRMED.

---

CALLAHAN, Circuit Judge, concurring and dissenting:

I agree with the first part of the majority opinion: the government may not racially discriminate in the administration of its services. *See* opinion at 894. I further agree that the right to the non-discriminatory administration of protective services is clearly established. *See* opinion at 894-895. Nonetheless, I write separately and dissent because I am concerned that the broad language in the majority's opinion fails to recognize the deference courts have given, and should give, police departments in determining when and how to investigate crimes. This underlying theme informs the two specific issues I address. First, I am leery of any suggestion that a person's right to equal protection extends to requiring an arrest of a third person; and second, I do not think that a reasonable offi-

cer in defendants' position was on notice that refusing to give Babauta a sobriety test might constitute a violation of Elliot's right to equal protection of the law. Of course, with the publication of this opinion Ninth Circuit law on this issue will be established.

However, I conclude that existing law did not provide the defendants with clear notice that their actions concerning Babauta violated Elliot's constitutional right to equal protection of the law. This distinction is exactly the purpose of the second prong of the test set forth in *Saucier v. Katz*, 533 U.S. 194 (2002): "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 202. Accordingly, I would hold that although defendants may have violated Elliot's right to equal protection of the law, they are entitled to qualified immunity because it would not have been clear to a reasonable officer that he or she was doing so.

I

The majority's opinion fails to distinguish between investigations and arrests and thus fails to appreciate that the discretionary determination to arrest someone is particularly unsuited to judicial review. The unique nature of the prosecutorial function, which includes the decision to arrest an individual, was recognized by the Supreme Court over thirty years ago in *Imbler v. Pachtman*, 424 U.S. 409 (1976). In *Imbler*, the Supreme Court affirmed the Ninth Circuit's holding that a prosecuting attorney who acted within the scope of his duties in initiating and pursuing a criminal prosecution is entitled to qualified immunity from suit under 42 U.S.C. § 1983 "for alleged deprivations of the defendant's constitutional rights." *Id*. at 410. In *Wayte v. United States*, 470 U.S. 598, 607 (1985), the Court reiterated that "the Government retains 'broad discretion' as to whom to prosecute" and that this "broad discretion rests largely on the recognition that the

decision to prosecute is particularly ill-suited to judicial review."

The prosecutor's discretion, however, is "subject to constitutional restraints." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *United States v. Batchelder*, 442 U.S. 114, 125 (1979)). In *Armstrong*, the Court explained:

> One of these constraints, imposed by the equal protection component of the Due Process Clause of the Fifth Amendment, *Bolling v. Sharpe*, 347 U.S. 497, 500 . . . (1954), is that the decision whether to prosecute may not be based on "an unjustifiable standard such as race, religion, or other arbitrary classification," *Oyler v. Boles,* 368 U.S. 448, . . . (1962). A defendant may demonstrate that the administration of a criminal law is "directed so exclusively against a particular class of persons . . . with a mind so unequal and oppressive" that the system of prosecution amounts to "a practical denial" of equal protection of the law. *Yick Wo v. Hopkins,* 118 U.S. 356, 373 . . . (1886).

> In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present "clear evidence to the contrary." [*United States v.*] *Chemical Foundation*, . . . [272 U.S. 1] . . . 14-15 [(1926)] . . . . We explained in *Wayte* why courts are "properly hesitant to examine the decision whether to prosecute." 470 U.S., at 608, . . . . Judicial deference to the decisions of these executive officers rests in part on an assessment of the relative competence of prosecutors and courts. "Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts

are competent to undertake." *Id.* at 607, . . . . It also stems from a concern not to unnecessarily impair the performance of a core executive constitutional function. "Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Ibid.*

517 U.S. at 464-65.[1] The Court went on to reaffirm that "[t]o establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." *Id.* at 465.

These cases, indeed almost all cases concerning selective prosecution, are brought by individuals who are challenging their prosecutions by the government. Here, Elliot's assertion is not that she was selectively prosecuted, but that her consti-

---

[1]Chief Judge Kozinski has acknowledged the deference owed to the decision whether or not to prosecute. In his dissent from the denial of rehearing en banc in *Untied States v. Mussari*, 168 F.3d 1141, 1143 (9th Cir. 1999), he wrote:

> The majority's complaint is that they did not give Mussari a pass for violating federal law. But whom to prosecute and whom to leave alone is the heart and soul of prosecutorial discretion, a decision committed to the Executive Branch and "particularly ill-suited to judicial review." *Wayte v. United States*, 470 U.S. 598, 607, . . . (1985).

He further commented:

> Reexamining prosecutorial decisions "entails systemic costs," such as delaying justice, chilling law enforcement, and "undermin[ing] prosecutorial effectiveness by revealing the Government's enforcement policy." *Id.* By injecting themselves into a process in which judges have no legitimate role to play, the majority has compromised the neutrality of the court and taken us into the treacherous waters of politics.

*Id.* at 1143.

tutional right to equal protection was violated by the officers' failure to investigate and arrest a third party, Babauta. As the decision to arrest and prosecute an individual is entitled to substantial deference from the courts, it follows that the decision not to arrest and prosecute a person is entitled to at least the same degree of deference. This does not suggest that it would be impossible for a plaintiff to allege and show that her right to equal protection was violated by an officer's failure to arrest a third party, but only to clarify that the decision to arrest — as opposed to the officer's duty to investigate — is part of the prosecutorial function and is therefore entitled to greater deference.

In addition, as a practical matter, it is not clear how Elliot was harmed by the defendants' failure to arrest Babauta. Certainly the failure to give him a sobriety test or to otherwise investigate his competency to drive may well have collateral consequences for Elliot. But had the defendants investigated Babauta's competency to drive, it is doubtful whether Babauta's arrest would have had any impact on Elliot. Accordingly, because the failure to arrest Babauta had little impact on Elliot and because the determination of whether to arrest an individual is entitled to enhanced deference, I question whether the failure to arrest Babauta constitutes a violation of Elliot's right to equal protection of the law.

In sum, I agree with the essence of the majority's opinion — that Elliot has a constitutional right not to have police services denied because of race — but would not hold that police services necessarily include the decision to arrest a third party.[2]

---

[2]Furthermore, I do not read the opinion as suggesting that courts should not continue to give considerable deference to the decisions of police departments on how they conduct investigations and perform their functions. While we hold that the "government may not racially discriminate in the administration of *any* of its services" (opinion at 894), the burden remains on a plaintiff to show that an alleged denial of services was due to racial animus and not some other reason.

## II

The majority's failure to distinguish between the police officers' duty to investigate and the decision to arrest a third party is symptomatic of its failure to consider the meaning of "protective services" when applying the second prong of the *Saucier* test. The second prong of the *Saucier* test requires an inquiry into "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. A careful review of the cases cited by the majority reveals that despite the language cited by the majority, they fail to place a reasonable officer in defendants' position on notice that his actions related to Babauta constituted a violation of Elliot's constitutional right to equal protection of the law.

The majority address the second prong of the *Saucier* test in broad strokes. It starts with the premise that the "right to non-discriminatory administration of protective services is clearly established" (opinion at 895), comments that "there doesn't need to be a prior case with materially similar facts in order for a right to be clearly established," (opinion at 896), asserts that "[w]e have recognized the absurdity of requiring equal protection plaintiffs to find a case with materially similar facts," (opinion at 896), and concludes that the "officers thus had a more than fair warning that failure to investigate and arrest Babauta because of race violated equal protection." Opinion at 897.

The simplicity of this approach is of little comfort or guidance to the police officers whose qualified immunity is dependant on their understanding of case law. As indicated, I agree with the majority that the Supreme Court has held that the government may not "selectively deny its **protective services** to certain disfavored minorities without violating the Equal Protection Clause." *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 197 n.3 (1989) (emphasis added). I also agree that this quote from *DeShaney* does not imply that

the "government can selectively deny its non-protective services to disfavored minorities." *See* opinion at 894. But this leaves unanswered the question of whether the defendants were on notice that their treatment of a third party, Babauta, constituted a violation of Elliot's right to equal protection of the law.

First, the defendants' actions concerning Babauta are not clearly within a commonsense meaning of "police protection." Here, the officers responded to the accident, inquired as to Elliot's injuries, called for an ambulance, and saw that she was safely transported to the hospital. Also, there was no possible additional harm to Elliot from Babauta following the accident as the police ensured that he was transported to the hospital and he was subsequently released to a friend or relative who drove him home. What the defendants failed to do, and what I agree may constitute a violation of Elliot's right to equal protection, was to investigate Babauta's alleged intoxication.[3] The failure to investigate an accident may fit within the definition of "protective services," but such a conclusion is by no means compelled.

Second, an examination of the cases cited by the majority fails to reveal any clear notice, or "fair warning," that an officer's treatment of one person will constitute the denial of "protective services" to another person. The opinion relies heavily on *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130 (9th Cir. 2003). *Flores*, however, is both factually and legally distinguishable and thus did not give the officers reasonable notice. It is factually distinct because it concerned the alleged failure of high school administrators to protect stu

---

[3]Because this appeal arises from a motion to dismiss on the basis of qualified immunity, we accept Elliot's allegation of racial discrimination as true. On remand, she will have the burden of showing that the officers' failure to investigate was racially motivated, and the officers will have an opportunity to present evidence that their actions were not racially motivated.

dents from "student-to-student anti-homosexual harassment." *Id.* at 1132. School administrators have a unique relationship with the students. *See Morse v. Frederick*, 551 U.S. 393, 406-08 (2007) (noting the "special characteristics of the school environment"). Indeed, the court in *Flores* recognized that "the defendants believed that, under District policies, harassment of any kind would not be tolerated." 324 F.3d at 1135. Police officers, however, do not have a relationship to the public or even to accident victims that is similar to a high school administrators relationship to a student. Moreover, Elliot does not allege a failure to "protect."

*Flores* is legally distinct because in that case we held that prior court cases had placed the defendants on notice that failure to enforce the school district's policies concerning sexual orientation violated the constitution. *Id.* at 1137 (citing *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 573-74 (9th Cir. 1990) (establishing that "state employees who treat individuals differently on the basis of their sexual orientation violate the constitutional guarantee of equal protection"). *Flores* indicated that a "right" need not be spelled out in a statute or federal regulation, and that there need not be a prior case that "defined the scope of a school administrator's duty." *Id.* Nonetheless, our task remained "to determine whether the preexisting law provided the defendants with 'fair warning' that their conduct was unlawful." *Id.* We concluded that case law alone could render the law "clearly established," and in that existing case law had done so. *Id.*

Thus, *Flores* offers a standard for determining the existence of a clearly established right, but it does not answer the question of what case law, regulation, or statute placed the defendants in this case on notice that failing to give Babauta a sobriety test would violate Elliot's constitutional right to equal protection of the law.

The other cases cited by the majority do not fill this gap. The opinion cites *Estate of Macias*, 219 F.3d 1018, 1028 (9th

Cir. 2000), which concerned a tragic situation where the police allegedly provided a woman inferior police protection from her estranged husband who then murdered her. On appeal, the issue before us was whether "the policy or custom caused the constitutional deprivation." *Id*. at 1027. We noted that "the district court assumed, without actually deciding that Mrs. Macias was deprived of her constitutional right to the equal protection of the laws." *Id.* Thus, our decision in *Macias* offers very little guidance on what type of police action or inaction violates a person's constitutional right to equal protection of the law.

Moreover, in *Macias* we went on to determine that the district court had erred in concluding that the denial of police protection caused Mrs. Macias' death. In doing so the court did state, as noted by the majority, that "[t]here is a constitutional right, however, to have police services administered in a nondiscriminatory manner — a right that is violated when a state actor denies such protection to disfavored persons." *Id*. at 1028. As the failure to protect Mrs. Macias from her husband was determined not to have been the cause of Mrs. Macias's death, the quoted language appears to be dicta. Furthermore, *Macias* clearly concerned protection, whereas the officers' actions at issue in this case had no impact on Elliot's "protection." The case cannot reasonably be read as giving the defendants a "fair warning" that the failure to test Babauta for alcohol would violate Elliot's right to equal protection of the law.

In addition, the reference to *DeShaney*, 489 F.3d 189, in the majority opinion in this case provides little guidance. In *DeShaney*, the Supreme Court basically held that a state had no constitutional duty to protect a child from his father after receiving reports of possible abuse. *Id*. at 191. This is clearly not analogous to the situation presented in this case. Moreover, the majority only cites to the language in a footnote: "[t]he State may not, of course, selectively deny its **protective services** to certain disfavored minorities without violating the

Equal Protection Clause." Opinion at 892-893 (quoting *DeShaney*, 489 U.S. at 197 n.3) (emphasis added). This raises, but does not answer, the question of what constitutes a "protective service." *DeShaney* does not address this question because, as the Supreme Court noted, "no such argument has been made here." *Id*.

The majority also cites *Monroe v. Pape*, 365 U.S. 167 (1961), but does not suggest how *Monroe* would have put the officers in this case on notice that their actions violated Elliot's constitutional right to equal protection.[4]

In addition, the majority cites the Sixth Circuit's opinion in *Smith v. Ross*, 482 F.2d 33 (6th Cir. 1973). In *Ross*, a deputy sheriff was alleged to have tried to "persuade" an inter-racial band to leave the building it had rented. The district court dismissed the complaint, the band members appealed, and the Sixth Circuit affirmed. *Id*. at 36-37. The majority's opinion in our case includes the following quote from *Ross*: "Particularly in view of the circumstances surrounding the passage of § 1983, including the concern for protecting Negroes from the widespread non-enforcement of state laws, . . . the remedies provided in § 1983 are most appropriately extended to persons who, because of the unpopularity of their life style or the pervasiveness of racist animus in the community, are not protected . . ." Opinion at 895 (quoting *Ross*, 482 F.3d at 37).

The usefulness of the quoted language is weakened when it is considered in the context of the *Ross* opinion. The Sixth Circuit goes on to state:

> We agree with appellants that a law enforcement

---

[4]*Monroe* held that allegedly illegal actions of city police officers respecting unreasonable search and seizure constituted actions taken "under color of" a state statute for the purposes of 42 U.S.C. § 1983, but that the municipal corporation was not a person within the meaning of the statute.

officer can be liable under § 1983 when by his inaction he fails to perform a statutorily imposed duty to enforce the laws equally and fairly, and **thereby denies equal protection to persons legitimately exercising rights guaranteed them under state or federal law.** Acts of omission are actionable in this context to the same extent as are acts of commission.

*Id*. at 36-37 (emphasis added). Thus, even assuming that the police in the Northern Mariana Islands may be held to be on notice of a 1973 Sixth Circuit opinion, it is doubtful that they would have gleaned much guidance from the opinion. It is difficult to conclude that the defendants' failure to test Babauta for alcohol denied "equal protection to [Elliot for] legitimately exercising rights guaranteed [her] under state or federal law." *Id*. at 36-37.

Finally, the majority cites *Flores v. Pierce*, 617 F.2d 1386 (9th Cir. 1980), which concerned allegations that city officials had discriminated against the Mexican-American plaintiffs on the basis of race or national origin in delaying the issuance of a liquor license. The majority opinion quotes the following sentence from *Pierce*: "[t]he constitutional right to be free from such invidious discrimination is so well established and so essential to the preservation of our constitutional order that all public officials must be charged with knowledge of it." Opinion at 896 (quoting *Flores*, 617 F.2d at 1392). "Such invidious discrimination," however, is defined in *Flores* in the preceding sentence, which reads: "No official can in good faith impose **discriminatory burdens** on a person or group by reason of a racial or ethnic animus against them." *Id*. (emphasis added). In the present case, it is difficult to conceive of the defendants' failure to test Babauta for alcohol as imposing a discriminatory burden on Elliot.

The allegations in *Benigni v. City of Hemet*, 879 F.2d 473 (9th Cir. 1989), are arguably closer to the facts in this case, but our opinion there does not provide the type of fair warn-

ing necessary under *Saucier*'s second prong. In *Benigni*, the plaintiff, an owner of a bar, filed an action under § 1983 against city police officers alleging that they harassed his customers with the intent of forcing him to sell his business. *Id*. at 475. The case went to trial, where the jury's verdict was mostly in favor of plaintiff, and the city and certain police officers appealed. *Id*.

We recognized that Benigni could maintain an equal protection claim.[5] *Id*. at 477. However, we held that "we need not rule directly on the equal protection claims since the general verdict in this case is sustainable under the standards enunciated in *Traver v. Meshriy*, 627 F.2d 934, 938-39 (9th Cir. 1980)." *Id*. at 478. We concluded that "Benigni's due process theory was clearly supported by evidence and is legally correct," and noted that "the due process and equal protection theories in this case are practically identical, both being grounded on the allegation of arbitrary law enforcement activity **for the purpose of harassment and interference**." *Id*. (emphasis added). *Benigni* informs us that police action against third parties (Benigni's customers) may amount to a denial of equal protection to the plaintiff (Benigni) when motivated by race discrimination. But the opinion also requires a "purpose of harassment and interference" which Elliot has not alleged and probably cannot allege.

In sum, although I agree that case law holding that it is unconstitutional for officers to discriminate based on race now extends to an alleged failure to provide police services, including the investigation of an automobile accident, this position was not so clearly established as to defeat defendants' claim of qualified immunity. Indeed, all the language

---

[5]We noted that "[e]lements of an intentional discrimination claim are present in this case because the evidence tends to show the discriminatory effect of greater law enforcement activity at the Silver Fox than at other bars, and the discriminatory intent of singling out Benigni based on his Italian ancestry." 879 F.2d at 477.

in the relevant cases concerning "protective services," "persons legitimately exercising rights," "discrimatory burdens" and even "purpose of harassment and interference" would be unnecessary if any action by a police officer allegedly taken based on racial animus inherently violated someone's right to equal protection of the law. More is necessary to ensure that the officer knows or should know that his inaction with respect to one person violates another person's constitutional right to equal protection of the law.

III

A unique feature of the second prong of the *Saucier* test is precisely that it applies only when a plaintiff's constitutional right has been violated.[6] Accordingly, our focus must shift from the plaintiff's rights and injury, to what the officer knew, or should have known, concerning the plaintiff's constitutional rights.

In *Saucier*, the Supreme Court explained: "if a violation could be made out on a favorable view of the parties' submissions, the next sequential step is to ask whether the right was clearly established," and commented that "it is vital to note" that this inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." 533 U.S. at 201. Indeed, the Court proceeded to explain that in the case before it, it was not enough that the law "clearly establishes the general proposition that use of force is contrary to

---

[6]The Supreme Court has held that in some instances a court may find qualified immunity without making a constitutional ruling under the first prong of the *Saucier* test. *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009) ("There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."). The Court, however, reiterated that a determination of notice under the second prong of the *Saucier* test is premised on the assumption of a constitutional violation. *Id.* at 816 (noting that "if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct").

the Fourth Amendment if it is excessive under objective standards of reasonableness." *Id.* at 201-02. Instead, it reiterated that:

> the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right . . . . The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

*Id.* at 202 (internal citation omitted).

This is the inquiry that the majority opinion fails to undertake "in light of the specific context of the case, not as a broad general proposition." *Id.* at 201. The majority leaps from the general proposition that police services cannot be denied on the basis of race to the fact-specific conclusion that the officers should have known that a failure to give Babauta a sobriety test and arrest him violated Elliot's constitutional rights. As noted in the prior section, there is no case law that even arguably assists the majority in this flight of reason. There is no suggestion that the officers had any heightened responsibility to Elliot or that there was a state created danger. *See Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1059 (9th Cir. 2006) (holding that an officer was not entitled to qualified immunity because a jury could find that he created a false sense of security). Rather, the majority concludes that because everyone knows that police services may not be denied because of race, the officers were on notice.

But in *Saucier*, the Court held that despite clearly established law that the use of excessive force was unconstitutional, this was not sufficient to place the defendant officer on

notice that his shoving a person into the van constituted excessive force. Indeed, the Supreme Court concluded that despite the clearly established law on the use of excessive force, under the specific circumstances in that case, the defendant was entitled to qualified immunity.[7]

Furthermore, we have held that the plaintiff has the burden of establishing the second prong of *Saucier. Kennedy*, 439 F.3d at 1065. Thus, the failure of any of the cases cited by Elliot, or by the majority, to address a similar factual situation — i.e., that an officer may deny one person equal protection of law by failing to investigate a third person — supports the district court's grant of qualified immunity. Of course, as indicated by our determination that defendants did violate Elliot's right to equal protection of law, a particularly prescient officer might have foreseen that his inaction would violate Elliot's right. But this is not the standard established by the Supreme Court in *Saucier* and reaffirmed in *Pearson*. Neither Elliot nor the majority cites any authority that fairly placed the officers on notice that cases denying qualified immunity for the denial of "protective services" allegedly on racial grounds would apply to all police services, including a determination of whether to investigate a third person. Accordingly, I would affirm the district court's finding of qualified immunity.

---

[7]The Court commented that "[a] reasonable officer in petitioner's position could have believed that hurrying respondent away from the scene, where the Vice President was speaking and respondent had just approached the fence designed to separate the public from the speakers, was within the bounds of appropriate police responses." *Saucier*, 533 U.S. at 208.