HAMILTON, Circuit Judge,
dissenting in part.
I agree with my colleagues that plaintiff has failed to state a claim against defendant Walker. I respectfully dissent from the rejection of plaintiffs equal protection claim against the City of Chicago. I am skeptical about plaintiffs ability to prove the claim, but his complaint should be sufficient to survive a motion to dismiss for failure to state a claim, even under the new and subjective pleading standards announced in Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). I explain first my skepticism, then some of the problems raised by Iqbal, and finally why the complaint should survive the motion to dismiss.
Mr. McCauley’s suit seeks to enforce the Fourteenth Amendment’s equal protection requirements against the decisions of a major city police force about how to allocate its resources. Plaintiffs only viable equal protection theory is that the Chicago police department made a deliberate decision to minimize the police protection available to victims of domestic violence, and that the police did so because of an intentional animus against women, who make up the vast majority of adult victims of domestic violence. See Bureau of Justice Statistics, U.S. Dept. of Justice, Family Violence Statistics 11 (2005), available at http://bjs.ojp.usdoj.gov/content/pub/pdfi fvs.pdf (last visited Oct. 17, 2011) (finding that women were 84% of spouse abuse victims and 86% of victims of abuse at the hands of a boyfriend or girlfriend).
As I said, I am skeptical about the plaintiffs ability to prove such a claim. We require proof of intentional animus and do not hold municipalities liable for a mere failure to arrest, no matter how tragic the consequences appear in hindsight. E.g., Hernandez v. City of Goshen, 324 F.3d 535, 538 (7th Cir.2003), following DeShaney v. Winnebago County Dep’t of Social Services, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). This approach avoids difficult questions that are all but unanswerable by courts in practice. To begin with, how should the police allocate their resources? And how should a federal court measure equality in the allocation of those resources? Should we focus on patrol officers on the beat per square mile? Per capita? Based on neighborhood crime rates? How should we gauge the seriousness of different crimes? Surely armed robberies deserve more attention than acts of vandalism, and attacks on vulnerable persons probably deserve more attention than bar fights.
A few moments of reflection could generate a list of many more variables and factors that a sensible citizen would want *621 the police to consider in deciding how to allocate their resources for crime prevention. And no matter how a police department decides to allocate its resources, it will be possible to identify categories of crime victims who receive below-average attention from the police. There is no way to ensure complete equality, and the infinite variations in the ways to measure equality require any court considering the question to act with great caution.
And yet the courthouse door must remain open to claims that the police are systematically denying some people the literal equal protection of the law. The history of the Reconstruction after the Civil War reminds us that state and local governments deliberately and systematically denied equal protection of the laws to former slaves and their descendants. More recently, the Jim Crow laws, internment of Japanese Americans, segregation, voting restrictions, gender discrimination, and harassment of Muslim Americans in the wake of the September 11, 2001 terrorist attacks all remind us that concerns about equal protection are not just matters of bygone history. A deliberate decision to withdraw or substantially reduce police protection to groups based on race, national origin, gender, religion, or political affiliation should qualify for federal court attention and remedies.
We and other federal courts have often recognized the legal viability of such claims, even if they are difficult to prove. See, e.g., Schroeder v. Hamilton School Dist., 282 F.3d 946, 957 (7th Cir.2002) (“the core violation of the equal protection clause is indeed the selective withdrawal of police protection from a disfavored group”) (Posner, J., concurring); Hilton v. City of Wheeling, 209 F.3d 1005, 1007 (7th Cir. 2000), citing Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 70, 21 L.Ed. 394 (1872); Elliot-Park v. Manglona, 592 F.3d 1003, 1007-08 (9th Cir.2010) (refusing to dismiss plaintiffs claim that officers’ failure to investigate and arrest a drunk driver because of alleged racial favoritism violated equal protection); Price-Cornelison v. Brooks, 524 F.3d 1103, 1113-14 (10th Cir. 2008) (affirming denial of qualified immunity where no rational basis was asserted for alleged policy of providing less protection to lesbian victims of domestic violence than to heterosexual victims), citing Watson v. City of Kansas City, Kansas, 857 F.2d 690 (10th Cir.1988); see also Okin v. Village of Cornwall-On-Hudson Police Dep’t, 577 F.3d 415, 438-39 (2d Cir.2009) (affirming summary judgment because plaintiff had not demonstrated the requisite disparate treatment of her domestic violence complaint); Burella v. City of Philadelphia, 501 F.3d 134, 148-49 (3d Cir.2007).
As a claim that may seem improbable but not impossible, difficult to prove but not implausible, this case poses a test for federal civil pleading standards in the wake of Ashcroft v. Iqbal. In Iqbal, plaintiffs alleged that they had been mistreated by federal law enforcement officials because of their religion and their national origin in the wake of the September 11, 2001 terrorist attacks on the United States. The appeal concerned the plaintiffs’ claims against the Attorney General of the United States and the Director of the Federal Bureau of Investigation. The Supreme Court recognized that the alleged actions of the federal law enforcement officials could have been perfectly legal so long as they were based on even-handed application of the law, but that mistreatment based deliberately on religion or national origin could violate the Constitution. 129 S.Ct. at 1952.
The Court held in Iqbal that the plaintiffs had failed to allege a plausible claim of religious or national origin discrimination against Attorney General Ashcroft *622 and FBI Director Mueller. Although the plaintiffs had alleged discriminatory intent, the Court found that the complaint did not “contain any factual allegation sufficient to plausibly suggest petitioners’ discriminatory state of mind.” Id. The Court wrote that determining whether a claim is plausible would “be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.” Id. at 1950. The method of analysis employed by the Court in Iqbal involved first “identifying the allegations in the complaint that are not entitled to the assumption of truth” because they are merely a “formulaic recitation of the elements” of the claim and thus “conclusory.” Id. at 1951. The Court then looked only to the portions of the complaint it deemed to be “factual allegations” to make a subjective plausibility determination.
As a subordinate federal court, it is our responsibility to do our best to apply the law as stated in Iqbal. My colleagues do so here, and the Iqbal standard is clearly decisive for the panel majority. The problem here is that it also our responsibility to do our best to apply other Supreme Court decisions involving pleading standards, including Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); Erickson v. Pardus, 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); and Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), as well as the Federal Rules of Civil Procedure as adopted by the Court and approved by Congress, and the form pleadings that are part of the Federal Rules of Civil Procedure and that were also approved by the Court and Congress. Iqbal is in serious tension with these other decisions, rules, and forms, and the Court’s opinion fails to grapple with or resolve that tension. I do not believe it is an exaggeration to say that these decisions, rules, and forms simply conflict with Iqbal.
As a result of this unresolved tension, since Iqbal was decided, the lower federal court decisions seeking to apply the new “plausibility” standard are wildly inconsistent with each other, and with the conflicting decisions of the Supreme Court. Iqbal has also generated a small blizzard of articles by law professors and practitioners critiquing the decision and analyzing its implications. One of the most useful and persuasive of those is Professor Arthur Miller’s article, From Conley to Twombly to Iqbal: A Double Play on the Federal Rules of Civil Procedure, 60 Duke L.J. 1 (2010). See also, e.g., Robert Bone, Plausibility Pleading Revisited and Revised: A Comment on Ashcroft v. Iqbal, 85 Notre Dame L.Rev. 849 (2010); Patricia W. Hatamyar, The Tao of Pleading: Do Twombly and Iqbal Matter Empirically?, 59 Am. U.L.Rev. 553 (2010) (finding statistically significant differences in the treatment of motions to dismiss, particularly with regard to civil rights cases); Hon. Colleen McMahon, The Law of Unintended Consequences: Shockwaves in the Lower Courts after Bell Atlantic v. Twombly, 41 Suffolk U.L.Rev. 851 (2008).
Without revisiting the entirety of this lengthy critique, I note below some of the key problems that Iqbal presents for federal district and circuit judges, and the parties and attorneys who litigate cases before them:
First, Iqbal’s reasoning and holding conflict with Rule 9(b), which requires that a party alleging fraud or mistake “state with particularity the circumstances constituting fraud or mistake.” As for other states of mind, however, the rule provides: “Malice, intent, knowledge, and other conditions of a person’s mind may be alleged generally.” In this context, “generally” means as a conclusion, without specifying *623 underlying facts that would support the inference. For example, this provision has long been understood not to require that discriminatory intent be alleged with particularity in employment discrimination eases. See Swierkiewicz, 534 U.S. at 512, 122 S.Ct. 992 (unanimously rejecting requirement that employment discrimination complaint plead facts satisfying elements of prima facie case, because “imposing the Court of Appeals’ heightened pleading standard in employment discrimination cases conflicts with Federal Rule of Civil Procedure 8(a)(2)”).
Note that Bell Atlantic Corp. v. Twombly endorsed the continued vitality of Swierkiewicz. 550 U.S. 544, 569-70, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); see also Miller, 60 Duke L.J. at 31. Iqbal also seemed to endorse the key Smerkiewicz holding regarding heightened pleading standards, noting that Rule 9 “excuses a party from pleading discriminatory intent under an elevated pleading standard.” 129 S.Ct. at 1954 (disclaiming a “rigid rule requiring the detailed pleading of a condition of mind” as “undesirable”). In the analysis that was actually decisive in the case, however, the Iqbal Court held that under Rule 8 the complaint lacked “any factual allegation sufficient to plausibly suggest petitioners’ discriminatory state of mind.” Id. at 1952. Iqbal does not elaborate on the nature and number of specific facts that must be included in the Rule 8 “short and plain statement of the claim” in order to achieve plausibility. The Court’s application of Rule 8 to impose a more demanding pleading standard for discriminatory intent is not consistent with its stated adherence to Rule 9 and its express authorization of general pleading of discriminatory intent and most other states of mind. The Court’s statement about Rule 9(b) that “ ‘generally’ is a relative term” does not solve the problem or give practical guidance to district courts. See id. at 1954.
Second, Iqbal conflicts with other recent Supreme Court decisions. Iqbal did not overrule or question a number of the Court’s prior cases on notice pleading. See Leatherman, 507 U.S. at 168, 113 S.Ct. 1160 (unanimously rejecting heightened pleading standard for custom-or-policy claim under 42 U.S.C. § 1983); Erickson, 551 U.S. at 90, 127 S.Ct. 2197 (after Twombly, summarily reversing dismissal of pro se prisoner’s complaint for deliberate indifference to medical needs where the court of appeals deemed the complaint too “conelusory” with respect to whether defendant’s actions caused “substantial harm,” and finding that: “The holding departs in so stark a manner from the pleading standard mandated by the Federal Rules of Civil Procedure that we grant review.”). Many cases, citing Leather-man, reject heightened pleading standards for the elements of a Monell custom or policy claim such as the one alleged here. See, e.g., Jackson v. Marion County, 66 F.3d 151, 153 (7th Cir.1995) (“Leatherman makes clear that the federal courts are not to interpolate a requirement of fact pleading into the federal rules.”). As noted, Iqbal also created tension with Swierkiewicz by endorsing its holding while simultaneously appearing to require the same sort of fact-specific pleading of discriminatory intent that the Swierkiewicz Court rejected.
Third, Iqbal conflicts with the form complaints approved by the Supreme Court and Congress as part of the Federal Rules of Civil Procedure. Rule 84 provides that the forms in the appendix “suffice under these rules and illustrate the simplicity and brevity that these rules contemplate.” Iqbal did not purport to overrule or amend Rule 84 or the forms, but it is difficult to reconcile the new “plausibility” standard *624 with those forms. Many of the approved forms require virtually no explanation of the underlying facts as long as the defendant is informed of the event or transaction that gave rise to the claim, according to the broad notice purpose of the rules.
For example, Form 15 is a complaint for the conversion of property. It is sufficient for the plaintiff to allege that on a stated date at a stated place, “the defendant converted to the defendant’s own use property owned by the plaintiff,” and to identify the converted property and state its approximate value. Nothing more is needed—no factual details about the defendant’s actions, and no allegation concerning the defendant’s state of mind. Under the plausibility standard of Iqbal, this form complaint seems remarkably “conclusory,” yet it is sufficient according to Rule 84.
Similarly, Form 11 is a complaint for negligence. Apart from jurisdiction and damages, it is sufficient for the complaint to say only that on a stated date at a stated place, defendant “negligently drove a motor vehicle against the plaintiff.” Again, nothing more is needed about just what the defendant did or why those actions amounted to negligence. This also seems quite “conclusory,” but it is sufficient under Rule 84. But cf. Branham v. Dolgencorp, Inc., 2009 WL 2604447, *2 (W.D.Va. Aug. 24, 2009) (applying Iqbal standard to dismiss slip-and-fall negligence complaint because it failed to allege “facts that show how the liquid came to be on the floor, whether the Defendant knew or should have known of the presence of the liquid, or how the Plaintiffs accident occurred”).
Even Form 21, which includes a claim to set aside a fraudulent conveyance, is remarkably terse. That portion of the form complaint says only that on a stated date, the defendant conveyed all or a specified portion of defendant’s real and personal property to another defendant “for the purpose of defrauding the plaintiff and hindering or delaying the collection of the debt.” Again, nothing more is needed about the circumstances of the conveyance, and the “general” or “conclusory” allegation of a purpose to defraud is sufficient. One could go on with parallel analysis of the other form complaints.
Unless one can plausibly explain away the tension between Iqbal and Rule 9(b) and the Rule 84-endorsed form complaints, then Iqbal conflicts with the Rules Enabling Act, 28 U.S.C. § 2071 et seq., and the prescribed process for amending the Federal Rules of Civil Procedure. See Swierkiewicz, 534 U.S. at 515, 122 S.Ct. 992, citing Leatherman, 507 U.S. at 168, 113 S.Ct. 1160; Hill v. McDonough, 547 U.S. 573, 582, 126 S.Ct. 2096, 165 L.Ed.2d 44 (2006) (“Specific pleading requirements are mandated by the Federal Rules of Civil Procedure, and not, as a general rule, through case-by-ease determinations of the federal courts.”).
Fourth, Iqbal’s reliance on the faet/conclusion dichotomy is highly subjective, and returns courts to the long disapproved methods of analysis under the regime of code pleading. See Miller, 60 Duke L.J. at 23-24. Is an allegation that “defendant was negligent” or that “defendant acted with racially discriminatory intent” an allegation of fact or a conclusion? Calling these assertions elements of the claim is not logically sufficient to determine when and if they should be denied a presumption of truth. Even in Iqbal, the Court presumed true some assertions that could be characterized as conclusory, while disapproving of others. See 129 S.Ct. at 1961 (Souter, J., dissenting). Iqbal’s reliance on the fact/conclusion dichotomy makes the difference indeterminate. Application of the dichotomy is leading to judge-specif *625 ic and case-specific differences in outcome that confuse everyone involved. The long legal history of code pleading, though perhaps distant enough in time to have been largely forgotten by most of today’s lawyers and judges, provides ample additional evidence on this point.
Fifth, Iqbal’s reliance on “judicial experience and common sense” invites the highly subjective and inconsistent results that have been observed. The Iqbal concept of plausibility is “context-specific.” 129 S.Ct. at 1950. As a practical matter, the concept invites district judges to exercise their individual views of the likely merits of the case at the outset, when the only information available is the complaint. Worse still, an uncritical reading of the Court’s “obvious alternative explanation” reasoning seems to invite judges to weigh competing explanations for alleged conduct and dismiss cases merely because they believe one explanation over another. See 129 S.Ct. at 1951 (referring to “more likely explanations”). In application, this standard bears a striking resemblance to the most stringent pleading requirement in American civil law, for pleading scienter in securities fraud claims, pursuant to the specific direction of Congress in the Private Securities Litigation Reform Act. See 15 U.S.C. § 78u-4(b)(2) (requiring plaintiff to “state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind”); accord, Tellabs, Inc. v. Makar Issues and Rights, Ltd., 551 U.S. 308, 323-24, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (explaining that a “strong inference” must be “cogent and compelling, thus strong in light of other explanations” for the defendant’s actions).
Congress has not imposed such a demanding standard for pleading in any other context—including civil rights and employment discrimination cases, which often turn on whether a defendant’s explanation for a decision is legitimate or merely a pretext covering for unlawful bias. Rule 9(b) and the Supreme Court decisions in Smerkiewicz and Leatherman permit plaintiffs to plead intent generally, meaning without the sort of specifics required under the PSLRA. But if the Iqbal pleading standard is applied in the district court, plaintiffs who already face the uphill battle of proving secret intent must now contend with the possibility of pre-discovery dismissal whenever the alleged pretext asserted by defendants in their motion to dismiss sounds plausible to the common sense of the particular judge. The potential harm of Iqbal in this context is that outcomes will vary based on how different judges view the plausibility of, for example, a police policymaker harboring and acting on improper motives toward women who complain of domestic violence.
As we struggle with these problems, it is important to recall that the Iqbal Court disclaimed such a probabilistic balancing, absent access to evidence, to determine which theory of the case seems more likely true. See 129 S.Ct. at 1949 (“The plausibility standard is not akin to a ‘probability requirement’.... ”). Although the Iqbal opinion used phrases such as “more likely,” and “as between,” it should not be read to say that a plaintiff should lose on the pleadings because a defendant had a more plausible alternative explanation. Rather, in light of the alternative explanation, plaintiff needed to “allege more by way of factual content to ‘nudg[e]’ his claim of purposeful discrimination ‘across the line from conceivable to plausible.’ ” 129 S.Ct. at 1952 (quoting Twombly, 550 U.S. at 570, 127 S.Ct. 1955). A plausible claim can seem less plausible or probable than the obvious alternative and still survive dismissal. Whether this distinction involves a real difference will depend on the care judges take not to ratify potential *626 false pretexts as “obvious” when making their common-sense plausibility determinations on bare pleadings.
For example, in this case, the majority relies on Brooks, in which we followed the reasoning in Twombly and said that the recited behavior was “just as consistent with lawful conduct as it is with wrongdoing.” Brooks v. Ross, 578 F.3d 574, 581 (7th Cir.2009). But this does not mean that we upheld the dismissal because a tie goes to the defendant. On its face, Iqbal leaves undisturbed the factual presumption in favor of plaintiff on a motion to dismiss. Id. Rather, the claims were dismissed because, absent more factual content, “Brooks’s allegations are too vague to provide notice to defendants of the contours of his ... claim.” Id. at 581-82. The primary purpose of notice pleading under Rule 8 is notice. Implausible pleadings do harm primarily by failing to ground themselves sufficiently in reality such that defendants can know what is claimed.[1] Similarly, in Swanson v. Citibank, N.A., 614 F.3d 400 (7th Cir.2010), we reversed dismissal of a complaint that only alleged racial discrimination generally, mentioning just the perpetrator and time-frame. These allegations were enough to “give the opposing party notice of what the case is all about.” Id. at 405.
The difference in result between Brooks and Swanson did not depend, in my view, on the existence of an obvious alternative explanation, which was present in both cases. See id. at 411 (Posner, J., dissenting in part). Nor is the Monell claim raised by McCauley here substantially more complicated than the discrimination alleged in Swanson. Rather, whether each of these complaints survives a Rule 12(b)(6) motion depends on a highly subjective plausibility determination. That determination must be made with great care, guided by an awareness of the core notice purpose behind Rule 8, as well as knowledge of the consequence of dismissing seemingly improbable, yet potentially meritorious, discrimination claims at such an early stage.
A simple thought experiment underscores the dangerous potential over-breadth of the Iqbal mode of parsing complaints—of first applying too aggressively the fact/conclusion dichotomy to a complaint, and then applying the “obvious alternative explanation” analysis to the facts that remain.
Imagine that as a federal district judge, you have read Twombly and Iqbal and now must act on a motion to dismiss an equal protection complaint in which the key paragraph reads:
The educational opportunities provided by defendants for infant plaintiffs in the separate all-Negro schools are inferior to those provided for white school children similarly situated in violation of the equal protection clause of the Fourteenth Amendment to the Constitution of the United States. The respects in which these opportunities are inferior include the physical facilities, curricula, *627 teaching, resources, student personnel services, access and all other educational factors, tangible and intangible, offered to school children in Topeka. Apart from all other factors, the racial segregation herein practiced in and of itself constitutes an inferiority in educational opportunity offered to Negroes, when compared to educational opportunity offered to whites.
Under the Iqbal approach, the first sentence merely recites a legal conclusion regarding the elements of an equal protection cause of action and thus should be excluded from the Iqbal analysis. The third sentence is similarly a bare conclusion that should also be ignored. Only the middle sentence contains what might amount to facts under Iqbal. A closer analysis, however, reveals an arguably fatal lack of explanation regarding how the listed items are inferior. The thrust of the sentence is a bare conclusion that all factors, tangible and intangible, contribute to the claimed deprivation. Does this complaint provide the specific factual content required by Iqbal?
Even if the alleged “respects in which these opportunities are inferior” might properly be called allegations of fact, it would be difficult for a claim of invidious discrimination to seem plausible in light of the obvious alternative explanations for these deficiencies. School boards possess limited resources. Perhaps they simply allocated those resources according to neutral factors. Disparity in outcome is just as consistent with the natural effects of lower socio-economic status as it is with pernicious effects of racial segregation. Or so the post-Iqbal argument might go.
The paragraph quoted above is, of course, taken directly from plaintiffs’ amended complaint in Brown v. Board of Education, filed on May 29,1951. Amendment to Paragraph Eight of the Amended Complaint, Brown v. Board of Education, 98 F.Supp. 797 (D.Kan.1951), available at http://www.clearinghouse.net/detail.php? id=5479 (last visited Oct. 17, 2011). We also know that the conclusory allegation of the third sentence eventually appeared as the holding of the unanimous Supreme Court in Brown v. Board of Education, 347 U.S. 483, 495, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (“Separate educational facilities are inherently unequal.”). Under the standards of Iqbal, however, it would be easy to argue that the plaintiffs in Brown failed to state a plausible claim for relief that could survive dismissal. The Court’s shift to “plausibility” pleading, and the assignment of interpretation of that standard to the subjective common-sense of individual judges, has markedly increased the danger of throwing out the proverbial baby with the bathwater.[2]
In the face of all these problems, what are the lower federal courts to do? These are all sources of controlling law that we are obliged to follow. Although careful analysis may help the lower federal courts determine, for example, that the Iqbal pleading standard would not require a different result in particular cases, there will be cases, and Mr. McCauley’s equal protection claim appears to be one of them, where the standard makes a decisive difference.
The first thing we can do is recognize the uncertainty that litigants, their lawyers, and district courts now face. As a result of that uncertainty, the courts of appeals should insist that in all but the most unusual situations, a party whose *628 pleading is dismissed based on the Iqbal plausibility standard should be entitled to an opportunity to amend the pleading after the court has made its decision. Allowing amendment after pleadings dismissals had long been our practice even before Twombly and Iqbal. See, e.g., Barry Aviation Inc. v. Land O’Lakes Municipal Airport Comm’n, 377 F.3d 682, 687 (7th Cir.2004) (quoting 5A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed. 1990)). Whether one favors broader or narrower readings of Twombly and Iqbal, no one denies that the cases are being interpreted as having caused an upheaval in long-settled law. Attorneys and parties trying to draft complaints and other pleadings will be left wondering about many important questions and contradictions that the Court has not yet addressed. Rule 1 instructs us to construe the Federal Rules of Civil Procedure to secure the just, speedy, and inexpensive determination of cases. The Supreme Court has often reminded us that pleading rules should be applied to facilitate a proper decision on the merits rather than to impose a series of traps in which one mis-step can be decisive. E.g., Swierkiewicz, 534 U.S. at 514, 122 S.Ct. 992 (“The liberal notice pleading of Rule 8(a) is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim.”), quoted in Christensen v. County of Boone, 483 F.3d 454, 458-59 (7th Cir.2007), and in Brooks, 578 F.3d at 580. We should exercise caution to avoid punishing parties for imperfect predictions as to how the subjective and inconsistent Iqbal standard might be applied in their case.
Some statistics show that generosity with regard to leave to amend appears to have increased under the new pleading regime, even as the total percentage of dismissal motions granted has risen. See Hatamyar, 59 Am. U.L.Rev. at 600 (analyzing statistics and finding a “noticeable increase in dismissals with leave to amend under Twombly and Iqbal ”). District judges should continue to grant such leave when they are concerned with the effects on plaintiffs that I have discussed above. They should also grant leave when doing so could prevent results in otherwise similar cases from diverging based merely on differences in plausibility determinations made by different judges according to their individual judicial experience and common sense.
Courts must freely give leave to amend under Rule 15(a) where interests of justice so require. Fed.R.Civ.P. 15(a); Foman v. Davis, 371 U.S. 178, 181-82, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Under this liberal rule, we allow amendment on remand in many procedural dismissal cases, and certainly do so when relevant decisional law changed after the complaint was filed. See, e.g., Ienco v. City of Chicago, 286 F.3d 994, 999 (7th Cir.2002). When, as here, the changed decisional law involves the standard for pleading itself, interests of justice call for an opportunity to amend essentially as a matter of course unless it is clear that the opportunity would be futile. In Iqbal itself, the Supreme Court remanded to the Second Circuit for a determination whether to further remand— so that plaintiffs could seek leave to amend. 129 S.Ct. at 1954; see also Iqbal v. Ashcroft, 574 F.3d 820, 822 (2d Cir.2009) (remanding to district court for determination regarding leave to amend). We have continued to permit such amendment after Twombly and Iqbal. .See, e.g., Bausch v. Stryker Corp., 630 F.3d 546, 562 (7th Cir. 2010). We should do so here.
But where that approach is not enough to resolve the case, I believe we must take care not to expand Iqbal too aggressively beyond its highly unusual context—allegations aimed at the nation’s highest-ranking *629 law enforcement officials based on their response to unprecedented terrorist attacks on the United States homeland—to cut off potentially viable claims. Iqbal exemplifies the old adage about hard cases. The failure of the Supreme Court to address all of the law that would conflict with broad application of the case should weigh heavily against that broad application, at least until the Supreme Court provides clearer guidance about how to reconcile Iqbal with its prior cases, the Federal Rules of Civil Procedure, and their accompanying forms.
Reading the present complaint as a whole, plaintiff McCauley has alleged the particulars of a plausible Monell claim. As the majority points out, McCauley has alleged the elements of such a claim using the relevant legal language. While some of these statements are conclusory in nature, they serve to notify defendants and the court of the type of claim being brought. There can be no doubt that the complaint provides sufficient notice of the circumstances that gave rise to the claims. McCauley made factual allegations that Chicago police failed to arrest Martinez despite knowledge of his harassment and violations, ¶ 25, and that this failure resulted from a custom of untimeliness and indifference with regard to the seriousness of domestic violence, ¶ 125(c) and (j). McCauley alleges “deliberate indifference” generally, see ¶ 126, but elsewhere describes numerous specific failures to act that are factually consistent with such an intent. See, e.g., ¶51. It is difficult to imagine what more McCauley might allege on the crucial question of intent without reciting a list of specific states of mind that Chicago police policymakers might have. We did not require such a recital in Swanson and we should not do so here.
By extending Iqbal to dismiss plaintiff McCauley’s equal protection Monell claim against the City of Chicago, the majority runs afoul of Leatherman, Rule 9(b), and the form complaints approved by the Supreme Court and Congress as part of the Federal Rules of Civil Procedure. Perhaps the Supreme Court majority intended Iqbal to work such a revolution in federal civil practice, but if so, the Court failed to grapple with the conflicts and did not express any direct rejection of these other governing sources of law. Under these circumstances, therefore, I would reverse the dismissal of plaintiffs equal protection claim against the City of Chicago and give him an opportunity to pursue discovery. Even if I agreed that the current version of the complaint failed to state a claim, I would remand with instructions to give plaintiff an opportunity to file an amended complaint to try to comply with the new and uncertain standards of Iqbal.

. Some commentators have noted a concern, underlying Twombly and Iqbal, with limiting defendants’ supposed burden of complying with discovery. See Miller, 60 Duke L.J. at 53-59; Bone, 85 Notre Dame L.R. at 859. Others answer with competing concerns about providing plaintiffs with access to courts in order to discover the actual but often hidden explanation for defendants’ harmful conduct. Given proper notice of the sort of claim being asserted, the Federal Rules of Civil Procedure give courts and parties powerful tools to confine the scope of discovery to relevant issues. See Fed.R.Civ.P. 26(b). I respectfully suggest that effective use of those tools is much more likely to control costs of litigation than the subjective and uncertain pleading standard of Iqbal, which has been multiplying litigation of pleading disputes.

. See also Miller, 60 Duke L.J. at 127-30 (applying a similar hypothetical analysis to the complaint in the seminal notice pleading case of Dioguardi v. Durning, 139 F.2d 774 (2d Cir. 1944)).